IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID DEBAUCHE,

                Plaintiff,                OPINION AND ORDER

v.

                                              17-cv-454-wmc

WISCONSIN DEPARTMENT OF CORRECTIONS, ET AL.,

                Defendants.

---

DAVID DEBAUCHE,

                Plaintiff,                OPINION AND ORDER

v.

                                              17-cv-524-wmc

WISCONSIN DEPARTMENT OF CORRECTIONS, ET AL.,

                Defendants.

---

*Pro se* plaintiff David DeBauche, a prisoner at Columbia Correctional Institution ("CCI"), filed these two lawsuits pursuant to 42 U.S.C. § 1983, claiming that several dozen defendants have been violating his constitutional rights in a multitude of ways. While DeBauche complains about a variety of issues in both lawsuits, his main focus in Case No. 17-cv-454 ("the '454 case") is his continued placement in administrative confinement, and the focus in Case No. 17-cv-524 ("the '524 case") is his medical care at CCI. Since filing his complaints, he has filed supplements in both lawsuits, which the court has reviewed along with his complaints for purposes of screening under 28 U.S.C. § 1915A. However, both of DeBauche's complaints are too unwieldy to proceed as one lawsuit each, so DeBauche will be required to submit an amended complaint in each lawsuit that corrects the deficiencies described below.

ALLEGATIONS OF FACT[1]

DeBauche is presently confined at CCI, where the events comprising his claims in both lawsuits took place.

I.   Case No. 17-cv-454

   A.   Defendants

The following defendants were employed at CCI during the relevant time period: Warden M. Dittman; "Assistant" Warden Rick; Security Director Lucas Weber; Captain Morgan; Unit Manager L. Walker; Program Services Supervisor Neuhauser; Inmate Complaint Examiner ("ICE") Mary Leiser; Inmate Complaint Supervisor Isaac Hart; Unit Manager Fink A. Bender; Correctional Officers Hunter, Stahl, Price and Kraft; and CCI Administrative Committee members Jane and John Doe. DeBauche also names C. O'Donnell and the Wisconsin Department of Corrections ("DOC"). DeBauche's allegations span from 2007 to the time he filed his complaint.

   B.   False Conduct Reports and Continued Administrative Confinement Status

DeBauche appears to be challenging his continued placement on administrative confinement, which he claims is premised on false conduct reports. DeBauche blames Walker, Dittman, Ruck, Weber, Morgan and Neuhauser for this status, which he represents has been continuous since 2007.

DeBauche challenges the December 2016 decision to keep him on administrative

---

[1] In addressing any pro se litigant's complaint, the court must read the allegations generously, resolving ambiguities and resolving reasonable inferences in plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

confinement, which appears to be memorialized in Exhibits B and C to his complaint. (Pl. Exs. B, C (dkt. #1-1 at 2-4).) DeBauche claims that the individuals that recommended his continued placement made false statements about his willingness to meet with them. He also challenges the May 2017 decision to keep him on administrative confinement status, and references Exhibit A to his complaint, a document that appears to memorialize that placement. (Pl. Ex. A (dkt. #1-1, at 1-2).) That document lists several disciplinary actions taken against DeBauche between 2007 and 2016. DeBauche claims these conduct reports were baseless, but CCI staff since have been citing to those conduct reports to justify his continued placement on administrative confinement status. DeBauche adds that various CCI officials also issued him false conduct reports after he filed another lawsuit, *DeBauche v. James*, No. 13-cv-553 (W.D. Wis. dismissed Jan. 11, 2016) ("the '553 case"). He claims that defendant Leiser was appointed to serve as his advocate, but she did nothing to help him.

### C. Complaints about Access to Courts and Handling of Legal Materials

DeBauche claims that various CCI staff took actions that prevented him from litigating his claims in the '553 case, as well as other matters. Apparently in 2014, he was moved to a different cell and CO Hunter destroyed all of his legal materials when he was moved. Additionally, when the institution was on lockdown status, he lost access to the law library.

DeBauche also claims that in 2017, prison staff enforced a policy promulgated by Security Director Weber that essentially forces prisoners to give up time in the day room for time in the law library. He also complains about a policy that began in June of 2017,

3

in which prisoners were more restricted in their law library time and were prohibited from using other prisoners for help in legal matters.

DeBauche also claims that his inability to access more legal loans has created a barrier to the courts. In particular, CCI's business office employees have frozen his trust account, denying him the ability to pay filing fees. He further claims that the business office has been inappropriately charging him for legal materials that he never received.

DeBauche also includes some allegations complaining that his legal mail has been opened outside of his presence, but he does not provide any details about when this has occurred or who opened his legal mail. He adds that his legal mail has previously been held for up to three months before delivery, apparently in an effort to cause him to miss court deadlines. He claims that A. Bender was involved in these events but does not provide any more detail than that.

### D. Inmate Complaints

DeBauche claims that ICE Leiser has refused to accept numerous inmate complaints he has filed, and that Isaac Hart has participated in her refusal to accept his complaints.

### E. Conditions of confinement

DeBauche includes several narratives complaining about various aspects of his conditions of confinement, but provides very little detail about when he was subjected to these conditions or who was involved. *First,* he complains generally about overcrowding and a difficulty accessing clean clothing and bedding. DeBauche alleges that has been unable to purchase necessary health, hygiene, canteen and other items, but he has not provided any details about who he has complained about these problems to, or when he

4

has had these issues. However, he does state that in May of 2017, Unit Manager Walker was aware that inmates were not receiving enough food.

*Second,* DeBauche includes allegations related to the condition of meal trays and that the heat in his cell is only turned on from November through March. DeBauche vaguely describes a few instances in October of 2016 when his blanket and warm clothes were removed from his cell and later returned, as well as a point in 2017 when a fire near his unit caused him to have difficulty breathing and an officer just told him to lie down.

*Third,* DeBauche adds stray allegations that he has not been able to receive communion on Christmas or Easter because he was in segregation.

*Fourth,* in a supplement to his complaint, DeBauche claims he has been harassed by officers Stahl, Price, Kraft and Fink in retaliation for filing this lawsuit. Specifically, on September 5, 2017, the toilet in DeBauche's cell overflowed, covering his floor and toilet in feces and sewage. After being briefly moved to the showers, DeBauche was moved back to the dirty cell. At one point, he was given a single rag to clean the mess. Officer Stahl allegedly laughed at him and refused to provide additional cleaning supplies. Later, in April of 2018, Unit Manager Fink apparently sent DeBauche to restrictive housing and when he returned, he was missing various items, including his legal materials related to this case. Apparently Fink refused to help find these items, in an effort to prevent him from litigating this case.

F. **Sexual Assault**

DeBauche outlines an incident on March 6, 2017, in which Nurse Walters sexually assaulted him during an examination by needlessly exposing his genitals in front of

correctional officers. He claims that his complaints about it were ignored.

**II.     Case No. 17-cv-524**

DeBauche's allegations in this case similarly span several years, from approximately 2012 to 2017. The main theme of this case challenges how CCI staff handled his physical and mental health treatment. However, like in the '474 case, DeBauche includes various general complaints about the conditions of his confinement, retaliatory conduct since he filed this lawsuit and he repeats the alleged sexual assault by Walters in 2017.

**A.     Defendants**

All of the named defendants were employed at CCI during the relevant time period, and include: Drs. Suebke, Suliene, Martin, Stange, Hoffman, Callister, Griffin, and Syed; nurses Dejarden and Walters; Warden Dittman; Sergeant Chattman; CCI Health Services Unit ("HSU") managers Anderson, Mashak, and Gohde; L. Walker; and correctional officers Stahl, Price and Kraft.

**B.     Treatment of Allergies**

Since 2006, DeBauche has suffered from an allergic reaction to the detergent used for laundering his clothes, bedding, and towels. The contact causes him painful eye irritation, a body rash, and severe difficulty breathing because his sinuses swell up. In 2006, Dr. Martin confirmed this allergy and DeBauche was provided fluticasone propionate nasal spray and loratadine 10 mg antihistamine tabs.

In approximately 2012 or 2013, Dr. Martin authorized DeBauche to launder his clothing on the unit. Dr. Martin also advised him that he would prescribe hypoallergenic

laundry detergent, which DeBauche would need to purchase, even though both Dr. Martin and HSU manager Anderson knew he was indigent. DeBauche claims that previously, the HSU has not required him to pay for the prescribed detergent. Dr. Martin and DeBauche also talked about the fact that his severe breathing problems would require him to be removed from an area before any tear gas is used there. However, apparently the HSU refused to acknowledge this order. As a result, guards use gas around DeBauche, which has made it impossible for him to breath. Most recently, Dr. Syed stopped his prescription for the nasal spray on April 5, 2016, leaving the antihistamine tabs as his only form of treatment.

C.     Treatment of Skin Condition

DeBauche has also been diagnosed with seborrheic dermatitis that affects his scalp and groin area, which he believes he contracted in 2006 or 2007. The dermatitis causes sores and painful pimples on his scalp that make it difficult to sleep. DeBauche claims that the HSU refuses to treat this condition and Dr. Syed cancelled a dermatologist appointment scheduled by Dr. Martin. Instead, the HSU and Dr. Syed preferred to "maintain" the condition and prevent the open sores from becoming infected by using products prescribed by Dr. Martin, including selenium sulfide lotion 2.5%, tera-gel tar shampoo, and anti-bacterial soap. DeBauche claims that these over-the-counter medications failed to cure his condition. Besides Dr. Syed, Debauche has been seen by Drs. Suliene, Martin, and Hoffman during this time period, and Debauche wrote to HSU managers Anderson, Mashak, and Gohde about this concern, none of whom altered Dr. Syed's approach. Ultimately, in April 2011, Dr. Syed cancelled the prescription for anti-

7

bacterial soap and later canceled the remaining prescriptions for tera-gel tar shampoo and selenium sulfide lotion in 2017.

### D. Treatment of Bladder and Prostate

Since approximately 2012 or 2013, DeBauche has had trouble urinating and emptying his bladder but he did not receive a prescription for Tamsulosin until May 2013. Shortly thereafter, on June 6, 2013, Dr. Martin and Anderson performed an ultrasound on DeBauche's bladder and prostate. An ultrasound technician showed DeBauche the results and explained how his bladder was not emptying. DeBauche claims that Anderson, aware of the technician's statements to DeBauche, claimed that nothing was wrong.

An additional ultrasound was performed in November 2015, but DeBauche did not provide details of what the ultrasound showed. At one point, Dr. Syed informed DeBauche that he would not provide treatment for the bladder and prostate issues other than what was currently being provided. Most recently, on April 15, 2017, Dr. Hoffman increased the Tamsulosin prescription.

### E. Back Problems

Since 2008, DeBauche has experienced severe and chronic lower back pain. He claims that he needs an "extra thick" mattress but has received a mattress that is only a quarter of an inch thick. This causes him to sleep in uncomfortable positions. At times, the pain is so extreme that he cannot get out of bed or move. He has reported this concern, as well as general concerns of back pain, to HSU manager Mashak. DeBauche alleges, however, that both Mashak and Dr. Syed have prevented the Special Needs Committee from providing him with an extra pillow to ease some of the back pain.

DeBauche describes one circumstance in which he was supposed to receive two bags of ice at a time to treat the back pain. After officers complained, however, the ice was reduced to one bag at a time. Additionally, officers would poke holes in the ice, mix dirt with the ice, or add salt so that it melted faster and created a mess on his clothes and bedding.

Furthermore, DeBauche alleges that Drs. Suliene and Syed have simply stopped treating his back pain. Specifically, on March 7, 2016, Dr. Syed stopped a variety of treatments that were apparently previously recommended, including a muscle rub, ice, and a restriction requiring officers to handcuff him in the front of his body. Additionally, while DeBauche claims he can no longer exercise, Mashak nonetheless told him to do jumping jacks to stay in shape. He reports that he now suffers from stage one muscle atrophy.

### F. Treatment Provided by Dr. Griffin

It is unclear when, but DeBauche previously received treatment from optometrist Dr. Griffin, who refused to treat his glaucoma or the effects of his allergies. In particular, Dr. Griffin cancelled a prescription for glaucoma medication and liquid tears until DeBauche filed a complaint with the state of Wisconsin. Also, while Dr. Griffin provided DeBauche with prescription lenses, another optometrist subsequently informed DeBauche that he had been given incorrect prescription lenses. DeBauche was later told that he would have to pay for the proper lenses himself.

### G. Treatment Provided by Nurse Walters

On March 6, 2017, Walters summoned DeBauche to the HSU to examine his groin for jock itch. He claims that although an antifungal is normally prescribed without an

9

exam, she pulled down his pants and underwear in front of guards to deliberately and unnecessarily expose his genitalia. He claims that she then unnecessarily moved his genitalia from side to side. DeBauche believes that this encounter constitutes sexual assault.

H. Dental Care

All inmates are supposed to be seen once per year for an annual exam, teeth cleaning, and oral x-ray. DeBauche claims that he has repeatedly needed to wait more than a year for such an appointment and, at one point, was required to wait from 2008 to 2013. He has several dental-related issues that sometimes cause intense pain but was told by a CCI dentist that they are nothing to be concerned about. Additionally, DeBauche had to use a baby gum massager to brush his teeth for several months following a stay in segregation. He claims that this has caused his gums to recede.

I. Mental Health Care

DeBauche claims that several CCI psychologists and other employees failed to provide adequate mental health services and treatment. First, Dr. Callister laughed at DeBauche and made insensitive comments when he described the effects he was experiencing from the antidepressant Effexor. Dr. Callister then refused to prescribe any other depression medication, and Effexor ultimately caused DeBauche to develop breasts and raised his blood sugar.

Around the same time, DeBauche claims that he did not leave his cell for any reason for fourteen consecutive months due to severe agoraphobia. Despite not meeting with him during this period, DeBauche alleges that CCI psychologists falsely claimed they had met

and stated that he was doing fine and coping well. He also claims that one unnamed psychologist told him that if she had his problems, she would kill herself.

Finally, during a time when DeBauche was receiving medication and therapy, his symptoms of anxiety and depression improved. He claims that Dr. Suebke then stopped all treatment and refused to meet with him, leading DeBauche to file a complaint with the Department of Safety and Professional Services.

### J. Retaliation by Dr. Suebke

No specific dates have been provided, but DeBauche alleges that after he filed a complaint against him, Dr. Suebke subsequently retaliated against DeBauche by having him stripped naked and thrown into observation on a seventy-two-hour hold. During the hold, DeBauche endured ridicule from guards and cold temperatures that caused him to shake. One CCI doctor did not listen to DeBauche's explanation for his shaking and refused to release him. Throughout the next seventy-two hours, DeBauche was only given three squares of toilet paper.

### K. Heat Sickness Incident

While waiting for a conduct report hearing, DeBauche was placed in a holding room with no ventilation during heat stroke conditions for more than an hour. He was physically restrained from getting water and was not provided any. He experienced extreme difficulty speaking. While the HSU was called, the person that responded only tested his blood sugar.

### L. Harassment After Filing the Complaint

Finally, in a supplement to his complaint, DeBauche repeats his allegations that

Stahl, Price and Kraft harassed him after he filed his complaint.

OPINION

Between these two lawsuits, plaintiff's allegations can be grouped into at least 20 categories of claims:

Case No. 17-cv-454 contains more than 10 categories of claims:

- **Lawsuit 1: Plaintiffs claim that defendants Dittman, Walker, Ruck, Weber, Morgan and Neuhauser have been continuously keeping him on administrative confinement status based on false conduct reports, in retaliation for litigating the '553 case.**

- **Lawsuit 2: Plaintiff's claim that CO Hunter destroyed his legal materials in 2014, which prevented him from litigating the '553 case.**

- **Lawsuit 3: Plaintiff's claim that in 2017, Security Director Weber instituted policies that prevented him adequate access to the law library and from using other prisoners to help with legal matters.**

- **Lawsuit 4: Plaintiff's claim that CCI's business office, including Bender, have prevented him from obtaining legal loans, frozen his accounts and charged him inappropriately for legal materials, all of which has curbed his access to the courts.**

- **Lawsuit 5: Plaintiff's challenge to defendants Leiser's and Hart's handling of his inmate complaints.**

- **Lawsuit 6: Plaintiff's complaints that in May of 2017, Walker knew prisoners were not receiving enough food and failed to take corrective measures.**

- **Lawsuit 7: Plaintiff's claim that in October of 2016, his blanket and warm clothing were confiscated following a search of his cell and not returned in a timely fashion.**

- **Lawsuit 8: Plaintiff's claim that Nurse Walters sexually assaulted him during an examination.**

- **Lawsuit 9: Plaintiff's claim that he has been unable to practice his religious beliefs while in segregation.**

- **Lawsuit 10: Plaintiff's claim that in September 2017, after filing his complaint, officers Stahl, Price, and Kraft have retaliated against him in various ways.**

- **Lawsuit 11: Plaintiff's claim that in April of 2018, Fink retaliated against him by failing to return items to him, in an apparent effort to prevent him from litigating this case.**

Similarly, Case No. 17-cv-524 contains at least ten categories:

- **Lawsuit 1: Plaintiff's challenge to how Drs. Syed, Suliene, Martin, and Hoffman, and nurses Anderson, Mashak and Gohde handled his allergies, skin condition, in 2011, 2016 and 2017.**

- **Lawsuit 2: Plaintiff's challenge to how Anderson reviewed his bladder and prostate ultrasound in 2013, and how Dr. Syed responded to his continued need for treatment for his bladder and prostate issues in 2015.**

- **Lawsuit 3: Plaintiff's complaints about how various staff, including Mashak, Dr. Syed and Dr. Suliene responded to his need for accommodations and pain relievers for his back problems.**

- **Lawsuit 4: Plaintiff's various challenges to Dr. Griffin's treatment for his eye issues.**

- **Lawsuit 5: Plaintiff's claim that Walters sexually assaulted him.**

- **Lawsuit 6: Plaintiff's challenge to CCI's dental care.**

- **Lawsuit 7: Plaintiff's claim that CCI's mental health care professionals, including Dr. Callister, failed to address his mental health care needs appropriately.**

- **Lawsuit 8: Plaintiff's claim that Dr. Suebke retaliated against him for complaining about him.**

- **Lawsuit 9: Plaintiff's claim that during some unspecified time he was held in an extremely warm room without water.**

- **Lawsuit 10: Plaintiff's claim that Stahl, Price and Kraft retaliated against him for filing this lawsuit.**

All of these claims are subject to dismissal for two reasons. *First*, these groups of claim outline at least twenty different lawsuits, not two. Under Rule 20 of the Federal Rules of Civil Procedure, a plaintiff may join claims together in one lawsuit if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(1)(A). As the Court of the Appeals for the Seventh Circuit has stated, "[a] litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot." *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012). If a complaint includes unrelated claims against different defendants in violation of Rule 20, a court may order that the lawsuit be severed. *Lee v. Cook Cty., Illinois*, 635 F.3d 969, 971 (7th Cir. 2011); *In re High Fructose Corn Syrup Antitrust Litig.*, 361 F.3d 439, 441 (7th Cir. 2004); *Aiello v. Kingston*, 947 F.2d 834, 835 (7th Cir. 1991). Even when the claims are related, the court has authority under Rule 21 and its inherent authority to sever a lawsuit when it would be unwieldy to allow a plaintiff to maintain so many claims against so many different defendants in a single case. *See Lee*, 635 F.3d at 971; *In re High Fructose Corn Syrup Antitrust Litigation*, 361 F.3d at 441.

Because plaintiff's claims are unrelated and, even if related his allegations are unwieldy and unmanageable, the court is dismissing plaintiff's complaints under Rules 20 and 21 and directing him to respond to this order explaining how he wishes to proceed on his claims. Plaintiff may proceed on only *one* of the identified lawsuits under each case number. Therefore, plaintiff must decide which lawsuit he wishes to pursue under the '454 case number and which lawsuit he wishes to pursue under the '524 case number. If he

wishes to pursue any of the other lawsuits identified above, he must do so by filing *separate* lawsuits with new and distinct case numbers. Plaintiff will be required to pay a separate filing fee for each additional lawsuit on which he chooses to proceed.

Regardless how plaintiff chooses to proceed, plaintiff must submit a new complaint in each case that clarifies his claims. Indeed, his current complaints and supplements contain vague and disjointed allegations, and plaintiff often omits details about when the events actually occurred and what proposed defendants were involved in the events underlying his claims. Specifically, plaintiff's amended complaints must satisfy Federal Rule of Civil Procedure 8, which requires that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the complaint must provide notice to the defendants of what plaintiff believes they did to violate his rights. Additionally, the complaint must contain enough allegations of fact to support a claim under federal law. *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. 544 (2007)).

In sum, before plaintiff may proceed further with any claim, he must respond to this order by:

> **(1) identifying which single lawsuit from the list above that he wishes to proceed with under each case number;**
>
> **(2) drafting an amended complaint in each lawsuit that complies with Rule 8 *and* includes only the allegations related to the single lawsuit on which plaintiff will proceed under each case number; and**
>
> **(3) filing any other lawsuits outlined above under new case numbers for which he will be required to pay filing fees**.

15

Plaintiff should draft his amended complaints as if he were telling a story to someone who knows nothing about the events at hand, focusing on providing a timeline of the materials events.  He should be sure to identify the specific defendants who are being sued and the specific actions taken by each defendant that plaintiff believes violated his rights.  Plaintiff should refrain from including legal arguments and extraneous background information, and instead should focus on laying out the allegations in a chronological fashion.  Additionally, plaintiff must be sure to include *all* of his allegations in his proposed amended complaints; he should not continue the practice of submitting "supplements" in an effort to add new claims or defendants to his lawsuits.  After the court receives plaintiff's response in each lawsuit, the court will screen each proposed amended complaint and determine whether these cases may proceed further.

ORDER

IT IS ORDERED that:

1) Plaintiff David D. DeBauche's complaints and supplements in the '454 and '524 cases are DISMISSED without prejudice under Federal Rules of Civil Procedure 8, 20 and 21.

2) Plaintiff has until **October 18, 2019,** to respond to this order as directed above.

3) For any lawsuit plaintiff dismisses voluntarily, he will not owe a filing fee and he will be permitted to refile the dismissed claims at a later date, provided that he complies with the applicable statute of limitations.

4) For any additional lawsuit plaintiff chooses to pursue, he will owe a separate filing fee.

5) Once plaintiff chooses which lawsuits he wants to pursue and files an amended complaint in the '454 and '574 case, the court will screen the claims to determine whether they state a claim upon which relief may be granted. If plaintiff fails to respond to this order by **October 18, 2019,** the court will dismiss his claims without prejudice for failure to prosecute.

6) Plaintiff's motions to delay screening and supplement in the '454 case (dkt. ##26, 27) are DENIED.

Entered this 27th day of September, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge